UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IRA BLOOM | : | Criminal No. 3:05CR178 (AVC) |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA | : | May 27, 2020 |

## UNITED STATES' OPPOSITION TO DEFENDANT'S
## EMERGENCY MOTION FOR REDUCTION OF SENTENCE

The defendant Ira Bloom has filed a motion asking this Court to reduce his sentence of

imprisonment under 18 U.S.C. § 3582(c)(1)(A) and order his immediate release, relying in part

on the threat posed by the COVID-19 pandemic. The United States respectfully opposes the

motion. This Court should deny the motion with prejudice because the defendant has not met his

burden of establishing that a sentence reduction is warranted under the statute. The defendant has

not met his burden to show that a sentence reduction is warranted in light of the danger that the

defendant would pose to the community if he were released. In addition, consideration of the

sentencing factors set forth in 18 U.S.C. § 3553(a) strongly disfavor any sentence reduction.

Accordingly, the Court should deny the defendant's motion.

## RELEVANT BACKGROUND

On October 6, 2006, the defendant, Ira Bloom, was found guilty by jury verdict of two

counts of Murder for Hire in violation of 18 U.S.C. § 1958(a) as a result of the defendant's

attempts to hire a hitman to kidnap, rape and brutally murder his ex-wife and dump her body in

Hartford, Connecticut. The jury found the defendant guilty of one count of using interstate

facilities in the commission of murder-for-hire and one count of interstate travel in the

commission of murder-for-hire. The Pre-Sentence Report ("PSR") accurately summarizes the

defendant's malicious, depraved and violent offense conduct. In addition, the PSR correctly

states that the defendant's "propensity toward violence is well documented via his criminal

history; however, not only his family has been target of his anger and rage."

I.      **The Defendant Terrorized His Ex-Wife For Years And Ultimately Tried
        To Hire Someone To Kidnap, Rape And Brutally Murder His Ex-Wife.**

      A.      **Soon After Their Marriage, The Defendant Started
                Terrorizing His Wife And Her Nine Year Old Child.**

Throughout their marriage, the defendant terrorized Zhanna Bloom Portnova and her

child from a prior marriage, who is referred to herein as "AP." As Zhanna describes it, the

"nightmare" began almost immediately. The defendant started to verbally abuse and berate

Zhanna, calling her a "stupid Russian immigrant." The defendant forced Zhanna to work to

financially support their family; indeed, the defendant forced Zhanna to go back to work almost

immediately after giving birth to their son, who is referred to herein as "SB." This is

corroborated by the financial documents filed in their divorce proceedings, which show that the

defendant provided little, if any, financial support for the family.

Moreover, the defendant started to physically abuse Zhanna's child from a prior marriage

(i.e., AP), who was nine years old when the defendant started abusing him. Over time, the abuse

escalated. Zhanna became afraid to leave AP home alone with the defendant. After abusive

incidents, however, the defendant would act remorseful and would promise that things would

change. Despite these promises, however, the cycle of violence persisted and the family

continued to live in a state of chaos. On one occasion in the middle of the winter, the defendant

picked AP out of bed and threw AP out of the house in his underwear. When Zhanna confronted

the defendant, he reportedly raped her. Although she contacted the police, she was too ashamed

to tell them what happened. According to Zhanna, she first requested a divorce in 1998. The defendant reportedly replied that he would kill her and AP if she tried to leave him. Zhanna held off on pursuing a divorce because she was afraid of the defendant.

In April 1998, the police responded to a domestic dispute and arrested the defendant for Assault and Battery. When the police arrived at the family's home, Zhanna was crying, appeared "shaken up" and had red marks on the side of her face. Zhanna told the police that the defendant got in a verbal argument with AP and then hit AP. When Zhanna tried to intervene, the defendant hit her. Zhanna then told the defendant that she did not want to live with him, which prompted the defendant to pick Zhanna up with one hand and carry her to another room, where he shook her and hit her in the face again. In her written statement to the police, Zhanna said that she was "afraid he will kill us one day." Zhanna further stated that every time she tells the defendant she wants a divorce, the defendant either hits her or threatens that she will never see their son, SB. While the defendant denied much of these allegations, the defendant was convicted of Assault and Battery in October 1998.

### B.    The Defendant Was Consumed By His Divorce And Custody Proceedings, Which Were Not Going Well For The Defendant.

In September 2002, Zhanna and the defendant separated. Around the same time, the defendant commenced divorce proceedings. The defendant and Zhanna became embroiled in a bitter divorce and custody dispute for almost three years. Records from the Probate and Family Court reveal that there were over 370 filings in those proceedings. Two of the witnesses at trial testified that the defendant became increasingly consumed by the divorce and custody proceedings. Whenever they talked to the defendant, he always talked about the divorce and custody proceedings, which were increasingly agitating and upsetting the defendant. The

defendant kept complaining about his distrust of the judicial system, as he kept losing legal battles during the divorce and custody proceedings.

After their separation and while the divorce and custody proceedings were on-going, the defendant continued to terrorize Zhanna. The defendant repeatedly drove by Zhanna's home and her place of employment. In addition, the defendant verbally harassed Zhanna over the telephone. According to Zhanna, she lived in a state of fear. At trial, the government presented evidence that the defendant tried to cut the brake line to Zhanna's car. Specifically, a witness testified that the defendant said that he (i.e., the defendant) cut the brake line to Zhanna's car. This was corroborated by Zhanna's testimony regarding her car problems and an automobile mechanic who provided testimony and business records showing that a hose line to Zhanna's car had been cut by a knife.

During the divorce and custody proceedings, Zhanna kept advising authorities that she was afraid that the defendant was going to kill her some day. In fact, on three occasions, Zhanna obtained restraining orders prohibiting the defendant from having contact with Zhanna or her children. Most recently, in June 2005, Zhanna confronted the defendant as he was trying to sell an antique rug that belonged to Zhanna. The defendant then threatened Zhanna, stating "You're not going to live long. I'm gonna kill you." As a result of the death threat, Zhanna obtained a civil restraining order against the defendant. Police officers served the restraining order on the defendant late at night, when the defendant returned from a Connecticut casino with Zhanna and the defendant's son (i.e., SB), who was eight years old at the time. The officers took SB from the defendant and returned SB to Zhanna, who had sole legal custody of SB. Almost immediately thereafter, the defendant placed telephone calls to two individuals, who testified at the trial.

These witnesses testified that the defendant was hysterical and stated words to the effect that Zhanna must die.

C.      **The Defendant Tried To Hire Someone To
Kidnap, Rape And Brutally Murder His Ex-Wife.**

Over the next two weeks, the defendant took numerous steps to try to hire someone to kidnap, rape and brutally murder Zhanna. The defendant was recorded during several telephone calls and meetings discussing his plans to have Zhanna murdered. The defendant wanted the crime to look like Zhanna was car-jacked early in the morning when she arrived at work. The defendant provided detailed information regarding Zhanna's car, where she works, when she arrives at work and where she parks.[1]

At this time, the defendant was in a dire financial condition. During the divorce and custody proceedings, the defendant sued Zhanna for alimony and child support, but did not get any money. By July 2005, the defendant, by his own words, was $65,000 in debt and owed money to everyone. Financial records from the divorce and custody proceedings reveal that the defendant was earning very little, if any, income and was seeking welfare assistance. During the recorded conversations, the defendant said that he would take the proceeds from Zhanna's life insurance policy, leave the country with SB and "screw" all of his creditors.

The defendant said that he would use a portion of the proceeds or "death benefit" for Zhanna's life insurance policy to pay someone $15,000 to murder her. The defendant said that no one knows about the life insurance policy and that it would take 90 days for the defendant to

---

[1] It bears mentioning that the Probate and Family Court had previously issued an order that explicitly prohibited the defendant from disclosing to any other person where Zhanna worked or a description of Zhanna's car.

receive the proceeds. Insurance records revealed that the defendant did in fact maintain and pay the premiums for an insurance policy covering Zhanna's life. The defendant was the sole beneficiary of the policy; as such, the defendant would receive a "death benefit" in the amount of $100,000 upon Zhanna's death. In addition, while the defendant let his own life insurance policy lapse, the defendant changed the address for Zhanna's life insurance policy to the defendant's P.O. Box in East Longmeadow, Massachusetts and continued to pay the premiums on the policy, unbeknownst to Zhanna. In fact, shortly before the defendant's arrest, he switched from an annual to a quarterly payment schedule of premiums, thereby reducing the last premium payment that the defendant made on Zhanna's life insurance policy.

The defendant was adamant that Zhanna needed to be murdered before the August 12, 2005, which was the next court date in the custody proceedings. Probate and Family Court records reveal that August 12, 2005 was in fact the next court date, at which time the defendant was facing contempt proceedings before Judge Sacks. During one recorded conversation, the defendant stated, "it has to look like a rape-murder. I have to go before Judge Sacks on August 12th on 8 counts of contempt. He has it in for me. I don't trust the system even though DSS is involved." During a subsequent recorded conversation, the defendant stated, "This will save me...I mean...I only owe my lawyer about five hundred dollars right now. If we go into court on, on August 12th, I'll owe him about fifteen grand, by then. So everything's done, I mean she's dead (shaking hands)."

While devising his plans to have Zhanna murdered, the defendant was very concerned with ensuring that he had an alibi, so that the murder could not be tied to him. The defendant stated during a recorded conversation, "They've already pulled out three restraining orders that

I've threatened to kill her. If this comes back and haunts me, he gets no money. And he, if he gets caught, he'll get his money as long as she's dead." The defendant also said that, as an alibi, he would have their eight year old child, SB, with him and suggested that he would take SB to a synagogue or another public place while the murder was being committed. Moreover, on numerous occasions, the defendant was adamant that Zhanna needed to be violently and brutally murdered. As the defendant stated prior to his arrest, "Its gotta look like a rape...She's gotta be raped and its gotta look like a...a complete mugging. Now, if he grabbed her with the freakin' car and dumped her in Hartford where they found the body a few hours later, and she was raped and brutalized and all that and they stripped the car down, that's a carjacking. It'd never come back to me. Never..."

II.      **The Defendant's Conviction, Sentence And Appeal.**

      A.      **The Defendant Was Convicted And Sentenced to 240 Months In Prison.**

Based on his offense conduct, a federal grand jury returned a superseding indictment charging the defendant with one count of using a facility of interstate commerce in the commission of a murder for hire and one count of traveling in interstate commerce in the commission of a murder for hire, both in violation of 18 U.S.C. § 1958(a). On October 6, 2006, after three days of evidence, a jury convicted the defendant of both counts. *See* PSR ¶ 1.

In advance of sentencing, the United States Probation Office prepared a presentence report ("PSR"). The PSR determined that the career offender enhancement set forth in U.S.S.G. § 4B1.1 applied to the defendant based on his prior Massachusetts convictions for assault and battery, assault and battery with a dangerous weapon, and assault with a dangerous weapon. *See* PSR ¶ 26. That enhancement placed the defendant in Criminal History Category VI, but the PSR

7

did not rely on U.S.S.G. § 4B1.1(b) to calculate the defendant's base offense level. *See* PSR ¶¶ 26, 40. The PSR instead determined a base offense level of 33 under U.S.S.G. §§ 2A1.5(a) and 2E1.4. *See* PSR ¶ 27. With a four-level adjustment under U.S.S.G. § 2A1.5(b) based on the defendant's offer of $20,000 for the hitman to undertake the murder, the PSR calculated a total offense level of 37. *See* PSR ¶¶ 28, 34. A total offense level of 37 and placement in Criminal History Category VI results in a guidelines range of 360 months to life imprisonment. *See* PSR ¶ 102. Each offense of conviction carried a ten-year statutory maximum penalty, *see* PSR ¶ 102, but U.S.S.G. § 5G1.2(d) advised the sentencing court to impose the sentences for each conviction to run consecutively.[2]

As reflected in the Statement of Reasons and consistent with the guidelines calculation set forth in the PSR, this Court calculated an effective guidelines range of 240 months of imprisonment. On April 29, 2008, the Court sentenced the defendant to 120 months of imprisonment on each conviction, to run consecutively, for a total term of 240 months. *See* Judgment entered on May 5, 2008. In imposing its judgment, the Court noted that it considered, among other things, the presentence report and its attachments, the submissions of the parties, everything that was presented at the sentencing hearing, including the arguments of counsel, and the factors outlined in 18 U.S.C. § 3553(a). The Court determined that, in light of all of these considerations, a sentence that was sufficient, but not greater than necessary to achieve the purposes of sentencing, was a total effective sentence of 240 months in prison.

---

[2] Without the career offender enhancement, Bloom would have remained at total offense level 37, but would have fallen to Criminal History Category II. *See* PSR ¶ 40. He therefore would have faced a guidelines range of 235-293 months of imprisonment, subject to the ten-year statutory maximum penalties and the stacking provision.

**B.      The Second Circuit Denied Bloom's Appeal And Affirmed His Conviction.**

Bloom pursued a direct appeal. On February 19, 2010, the United States Court of Appeals for the Second Circuit ("Second Circuit") rejected the defendant's appeal and affirmed the judgment of this Court. *See United States v. Bloom*, 366 Fed. Appx. 285 (2d Cir. Feb. 19, 2010) (summary order). On June 21, 2010, the Supreme Court denied Bloom's petition for a writ of certiorari. *See Bloom v. United States*, 561 U.S. 1016 (2010).

On June 27, 2011, the defendant filed a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255, alleging that his trial counsel and appellate counsel were constitutionally ineffective. *See Bloom v. United States*, 3:11cv1039, Dkt. No. 1. On March 12, 2012, this Court denied the defendant's motion. *See Bloom v. United States*, 3:11cv1039, Dkt. No. 20. Bloom thereafter filed several supplemental submissions seeking relief, but on October 31, 2012, this Court denied the defendant's supplemental motions. *See Bloom v. United States*, 3:11cv1039, Dkt. Nos. 25-28. In addition, this Court denied the defendant's motion for a certificate of appealability. *See Bloom v. United States*, 3:11cv1039, Dkt. No. 30.

On May 7, 2013, the Second Circuit denied the defendant's motion for a certificate of appealability and dismissed his pending appeal. *See Bloom v. United States*, 12-4737, Dkt. No. 52; *see also Bloom v. United States*, 3:11cv1039, Dkt. No. 31. On October 7, 2013, the Supreme Court denied the defendant's petition for a writ of certiorari. *See Bloom v. United States*, 12-4737, Dkt. No. 70. On December 16, 2013, the Supreme Court denied Bloom's petition for rehearing. *See Bloom v. United States*, 12-4737, Dkt. No. 72. Thereafter, the defendant filed multiple motions to file a successive § 2255 petition that were denied.

9

**III.**     **The Defendant's Request For A Sentence Reduction.**

On or about May 12, 2020, the defendant filed a motion with this Court seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A) on the ground that he suffers from a number of medical illnesses/conditions that increase his vulnerability to serious illness if he contracts COVID-19. Specifically, the defendant identifies the following medical conditions and/or illnesses: COPD; asthma; chronic bronchitis; diabetes mellitus; high blood pressure; and neuropathy/necrosis. *See* Def. Motion at 2. According to the defendant's motion and the attachments to his motion, the defendant has sought relief from the warden at FCI Fort Dix. According an email attached to his motion, the staff at FCI Fort Dix advised the defendant that he is not eligible for release to home confinement based on his "serious history of violence scoring and disciplinary history." *See* Def. Motion, Attachment #1. Fort Dix staff advised that the defendant's crime, namely, his efforts to hire someone to murder his ex-wife and his recorded statement that "it has to look like a rape-murder," qualifies as a crime of violence under BOP policy. According to the defendant's motion and his attachments, as of March 12, 2020, he has served 14 years, 8 months and 5 days of his sentence. With Good Time credit, his projected release date is August 5, 2022, and without Good Time credit, his full term release date would be July 7, 2025.

## LEGAL FRAMEWORK

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence

only if the motion was filed "after the defendant has fully exhausted all administrative rights to

appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30

days have passed "from the receipt of such a request by the warden of the defendant's facility,

whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of

imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds,

as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and

(ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing

Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that

he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir.

2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of

sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may

reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that

(i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a

danger to the safety of any other person or to the community, as provided in 18 U.S.C.

§ 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.3

---

[3] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

## ARGUMENT

### I.    The Defendant's Sentence Should Not Be Reduced Because The Defendant Poses A Significant Danger to the Safety of the Community.

The defendant's request for a sentence reduction should be denied because he has failed to demonstrate that he is not a danger to the safety of the community. Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2).

It is beyond question that the defendant would pose a danger to the safety of the community -- especially, to the safety of his ex-wife and her son, AP -- if he were released. Indeed, the trial evidence more than amply demonstrates that the defendant would pose an extreme danger to the safety of his victims if he was released from custody. The trial evidence demonstrated that the defendant is malicious, depraved and violent, especially towards his ex-wife, Zhanna, and her children.

Throughout their marriage, the defendant terrorized Zhanna and her son AP. As Zhanna describes it, the "nightmare" began almost immediately. The defendant started to verbally abuse and berate Zhanna, calling her a "stupid Russian immigrant." Moreover, the defendant began to physically abuse AP and Zhanna. On one occasion after the defendant physically assaulted Zhanna, she told the police that she was "afraid [the defendant] will kill us one day."

While Zhanna and the defendant were going through divorce proceedings, the defendant continued to terrorize Zhanna. At trial, the government presented evidence that the defendant tried to cut the brake line to Zhanna's car. Scared for her life, and the safety of her children, on three occasions, Zhanna obtained restraining orders prohibiting the defendant from having contact with Zhanna or her children. In June 2005, the defendant threatened Zhanna, stating "You're not going to live long. I'm gonna kill you."

Unbeknown to Zhanna, the defendant took out a life insurance policy on her life. The defendant was the sole beneficiary of the policy; as such, the defendant would receive a "death benefit" in the amount of $100,000 upon Zhanna's death. Meanwhile, the defendant cancelled his own life insurance policy, but maintained the policy covering Zhanna's life. Thereafter, the defendant tried to hire someone to kidnap, rape and brutally murder Zhanna. The defendant was

adamant that Zhanna needed to be murdered before their next court hearing in their custody proceedings.

While devising his plans to have Zhanna murdered, the defendant was very concerned with ensuring that he had an alibi, so that the murder could not be tied to him. The defendant said that, as an alibi, he would have their eight year old child, SB, with him and suggested that he would take SB to a synagogue or another public place while the murder was being committed. Moreover, on numerous occasions, the defendant was adamant that Zhanna needed to be violently and brutally murdered. As the defendant stated prior to his arrest, "Its gotta look like a rape...***She's gotta be raped*** and its gotta look like a...a complete mugging. Now, if he grabbed her with the freakin' car and ***dumped her in Hartford*** where they found the body a few hours later, and she was ***raped and brutalized*** and all that and they stripped the car down, that's a carjacking. It'd never come back to me. Never..." (emphasis added).

Further, as stated in the PSR, the defendant's "propensity toward violence is well documented via his criminal history; however, not only his family has been the target of his anger and rage." The PSR correctly stated that the defendant has "threatened and attacked code enforcement officers and maliciously destroyed the property of another when he intentionally crashed his motor vehicle into another automobile." As stated in the PSR, the defendant "appears to lack the ability to effectively control his anger and thus, his behavior has been unpredictable and, on previous occasions, dangerous to those with whom he comes into contact." The defendant's propensity towards violence is demonstrated by, among other evidence, the following criminal history:

- In April 1998 the defendant was arrested and in October 1998 the defendant was

convicted of assault and battery as a result of the defendant's abuse of Zhanna and AP. The defendant was charged with striking Zhanna and striking Zhanna's son (i.e., AP), who was 11 years old at the time. According to the police report, Zhanna told the police that she was afraid that the defendant would kill them one day. Zhanna further stated that every time she told the defendant that she wanted a divorce, the defendant either hit her or threatened that she would never see their son (i.e., SB) again. In October 1998, the defendant violated his probation with respect to this charge.

- While the assault and battery charges were pending, the defendant was arrested in September 1998 and convicted in March 1999 of malicious destruction of property. This conviction resulted from the defendant ramming another vehicle with his own vehicle. According to the police report, the defendant had been repeatedly warned by the police and by the courts to stay away from the victim in that case.

- While the defendant was on probation for assault and battery of Zhanna and her 11-year old son and for malicious destruction of property, the defendant was arrested and charged with two counts of assault and battery in September 1999. The defendant was charged with assaulting two tenants. It appears that these charges were nolled in July 2000.

- While the defendant was on probation for assault and battery of Zhanna and her 11-year old son and for malicious destruction of property and while the two assault and battery charges (referenced above) were pending, the defendant was arrested in September 1999 for assault and battery and for assault with a dangerous weapon. The defendant was charged with trying to run over a city building inspector with his car and with trying to sic a pit bull on another building inspector. The defendant was convicted of assault and battery and of assault with a

dangerous weapon in July 2000.

•    While the defendant was on probation with respect to the above-referenced crimes, the defendant terrorized Zhanna and AP, resulting in, *inter alia*, at least three restraining orders against the defendant. Further, as discussed herein, the defendant flatly disregarded the Probate and Family Court's order prohibiting the defendant from disclosing to any other person where Zhanna worked or a description of Zhanna's car. In addition, the defendant apparently violated other orders issued by the Probate and Family Court, as evidenced by the contempt proceedings against the defendant.

In sum, the trial evidence and the PSR provide numerous examples of the defendant's malicious, depraved and violence conduct towards others in the community. If he were released from BOP custody, there is more than ample evidence that the defendant would present a significant risk of danger to others in the community. Accordingly, this Court should deny a sentence reduction because the defendant cannot meet his burden to show that he is not a danger to any other person or the community.

## II.    The Sentencing Factors Under 18 U.S.C. § 3553(a) Strongly Weigh Against A Sentence Reduction.

The defendant's request for a sentence reduction because consideration of the sentencing factors under 18 U.S.C. § 3553(a) strongly support that the defendant serve his full sentence. Under the applicable policy statement, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020). As discussed herein and demonstrated by the statutory maximum prison sentence that this Court originally imposed, the § 3553(a) factors strongly disfavor a sentence reduction.

16

Consideration of the factors under 18 U.S.C. § 3553(a) strongly dictate against a sentence reduction and in favor of the defendant serving his full sentence (i.e., 240 months in prison, less any time for good-time). As an initial matter, "the nature and circumstances of the offense and the history and characteristics of the defendant" strongly support a sentence of 240 months' imprisonment. See 18 U.S.C. § 3553(a)(1). As discussed in detail above and as stated in the PSR, the defendant's "propensity toward violence is well documented" and "not only his family has been the target of his anger and rage." As also noted in the PSR, despite the fact that the defendant was "raised by loving and supporting parents in a close knit family and community" and despite the fact that the defendant "is well educated and a reportedly religious man," the defendant "has failed to protect his family and, in fact, he destroyed his family when he planned to have the mother of his child kidnaped, raped and brutally murdered." Indeed, the defendant wanted his ex-wife raped, brutalized and her body dumped in Hartford, Connecticut, while the defendant used their eight year-old son as an alibi.

In addition, a sentence of 240 months' imprisonment is strongly needed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; "to protect the public from further crimes of the defendant"; and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." See 18 U.S.C. § 3553(a)(2)(A)-(D). Indeed, the need to protect Zhanna and her family is highlighted by the fact that the defendant tried to hire someone to kidnap, rape and brutally murder Zhanna even though, by the defendant's own words, "[Zhanna had] already pulled out three restraining orders that I've threatened to kill her." In fact, Zhanna had obtained a restraining order against the

17

defendant based on his death threats on June 29, 2005 -- only nine days before the defendant finalized plans to have Zhanna murdered.

In sentencing the defendant, the Court also should take into consideration the severe and devastating impact that the defendant's offense conduct had on Zhanna and her children. As set forth in the PSR, Zhanna is now "afraid of everything." Zhanna is "continually 'paranoid' when leaving her home and 'constantly looking over her shoulder' when out in public." Zhanna lives in "constant fear." Simple tasks, such as going to a mall or a crowded area, now provoke fear and anxiety. Knowing that the defendant actually plotted to have Zhanna murdered in a brutal manner has devastated Zhanna and her children's lives. SB routinely awakes during the night "screaming" from nightmares. A letter written by Doctor Sidney Hyman, who has provided treatment for SB, states that SB now feels "sufficiently safe to consistently vent his intense dislike of and rage toward his father. He has revealed that he was terrified of Mr. Bloom's anger and his abusive treatment, and he often stated the wish that his father be sentenced . . . at the very least, to life in prison without the chance of parole." Dr. Hyman further stated that, in his professional opinion, "contact or communication between [SB] and his father is not in the boy's psychological best interest."

Finally, a sentence of 240 months' imprisonment is needed "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." As addressed at the defendant's original sentencing hearing and discussed in the government's sentencing memorandum, defendants who commit multiple counts of use of interstate commerce in the commission of murder-for-hire receive sentences in excess of 360 months' imprisonment. Moreover, defendants who use interstate commerce in the commission of

murder-for-hire receive guideline sentences and, in some cases, sentences at the *high-end* of their

Guidelines range. A sentence of 240 months' imprisonment is needed "to avoid unwarranted

sentence disparities" from sentences received by "defendants with similar records who have been

found guilty of similar conduct."

In sum, consideration of the factors under 18 U.S.C. § 3553(a), including the violent and

brutal nature of the offense, the defendant's violent history, the need for the sentence to reflect

the seriousness of the offense, to promote respect for the law, and to provide just punishment for

the offense, the need to protect the victim and her family from the defendant, the need for

general and specific deterrence and the need to avoid a substantial and unwarranted disparity

from sentences received by defendants with similar records who have been found guilty of

similar conduct, strongly dictate against any sentence reduction.

## III.     BOP's Response to the COVID-19 Pandemic.

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused

many deaths in the United States in a short period of time and that has resulted in massive

disruption to our society and economy. In response to the pandemic, BOP has taken significant

measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's]

highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19,

2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp. Indeed,

BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division,

Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at

https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and

19

detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization. On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently governs operations. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training. All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, such as Philadelphia, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended until at least May 18, 2020, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff. Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP.   Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders. Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff

alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

According to Bureau of Prison data, as of May 26, 2020, there are 2,861 total inmates at FCI Fort Dix, comprised of 2,660 inmates at the FCI and 201 inmates at the camp. Of these inmates, there currently are 22 inmates and 0 staff who are positive for the coronavirus. FCI Fort Dix reports that 26 inmates and 5 staff have recovered from the coronavirus, and 0 inmates and 0 staff have died from COVID-19.

## **CONCLUSION**

For the reasons discussed in this memorandum, this Court should deny the defendant's

motion because the defendant has not met his burden of establishing that a sentence reduction is

warranted under the statute.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

/s/ Geoffrey M. Stone

GEOFFREY M. STONE
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. CT 25326
450 Main Street
Hartford, Connecticut   06103
Telephone (860) 947-1101

## CERTIFICATE OF SERVICE

This is to certify that on May 27, 2020, a copy of the foregoing Memorandum was filed
electronically and served by mail on anyone unable to accept electronic filing. Notice of this
filing will be sent by email to all parties by operation of the Court's electronic filing system or by
mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.
Parties may access this filing through the Court's CM/ECF System. In addition, I hereby certify
that a copy of the foregoing memorandum was deposited to be sent by mail on or about the
above-date to the following:

Ira Bloom
Prisoner No. 16695-014
FCI Fort Dix
Federal Correctional Institution
P.O. Box 2000
Joint Base MDL, NJ 08640

/s/ Geoffrey M. Stone

GEOFFREY M. STONE
Assistant U.S. Attorney